May it please the Court, Maria Remue for the appellant adoptive families who are challenging the dismissal of their lawsuit against the State of Oregon, challenging the State of Oregon's across-the-board reduction in adoption assistance payments due to Oregon budgetary shortfalls. The plaintiff adoptive families are challenging the reduction as a violation of their federal rights to have their payments determined, individually determined, in accordance with the statute. There are three main issues on appeal. Whether or not the adoption assistance statute confers a federal right to have their payments determined individually in accordance with the statute. Whether Oregon's implementation of the reduction afforded the families adequate due process. And whether Oregon's post-judgment implementation of a regulation increasing adoption assistance payments moots the adoptive families' claim before this Court. I'd like to start with whether or not the adoption assistance program statute confers federal right upon the adoptive families to have their payments individually determined. State of Oregon and the District Court concurred that the adoption assistance statute does not provide a federally enforceable right for the plaintiffs to have their adoption assistance payments determined in accordance with their adoption assistance agreements. We believe that the State of Oregon and the District Court improperly apply the line of cases dealing with whether or not a Section 1983 action conferred, whether or not a federal statute under Section 1983 confers a federal right. I think what the Court did was to merge two arguments. They did not properly distinguish between the implied right of action cases and the Section 1983 cases. Supreme Court in Gonzaga noted that the inquiry is the same in both cases with respect to determining whether or not Congress intended to confer a federal right. However, the second determination of whether or not Congress intended to confer the federal remedy of bringing a private action in federal court. In this case, the District Court, instead of looking first to whether or not the text and structure of the AAP statute conferred a federal right, and then determining as a presumption whether or not the statute contained a comprehensive remedial scheme to preclude private enforcement, what the Court did was really to apply the second prong of the implied right of action cases by looking to whether Congress intended to confer a federal remedy. Well, let's get to the substance of that, because it's the piece of this that has bothered me the most. And that's simply, if given that Congress did provide that the state and the parents were to enter into binding agreements, which are presumably separately enforceable by their own terms, why would they do that if there was also an intent on the part of Congress to create a federally enforceable right under 1983? Well, I think there are two answers to that. I think that the intent of the intent of Congress in creating the agreement was to guarantee certainty to the parents in terms of future payments. But I think that the issue in this case is whether or not the payments were determined in accordance with the statute. And that is something that cannot be determined by the agreement itself, number one. And number two — Well, you're not challenging the amounts of — the payment amount that was set forth in the agreements. You're not trying to argue that the agreements are somehow defective. The point, as I understand it, is the state didn't live up to the agreements. That's correct. And I think what we're challenging is, is that the regulation that permits across-the-board reduction is a payment determination that violates the statutory right to have your payment determined individually. We're not challenging — we're not challenging whether or not the state violated the agreements to pay them a particular amount. And we're not asking the court to decide whether or not the agreement — whether or not the amount that the parents are receiving is in accord with their agreement. What we're saying is that the regulation — Did you possibly have the claim that you say you're asserting and not have a claim directly under the agreements? I mean, if the parents had agreed to new numbers, there's no breach of agreement claim. Doesn't that end it? Isn't the problem here that the parties agreed to a number that the state didn't pay? And that's the possible breach of agreement claim that could be brought elsewhere. Yes. The — in essence, the — there is the question of whether or not the state has actually breached their agreement. But, again, I think that the issue really is whether or not — whether or not the state has constructed a payment determination scheme that is inconsistent with the parents' right to have their payments individually determined under the statute. Sure it has. I mean, it's what the statute says is that the payments should be the payments agreed upon. Right. And plainly, the state hasn't paid what's been agreed upon. But that's exactly the same claim that would be made in substance in a breach of agreement claim. I mean, I'm not disputing that you've got an argument that the state hasn't theoretically followed the regulation. But I can't see a situation where you wouldn't also have a direct breach of agreement claim. And if that's the case, then why infer that Congress created a separate 1983 action? Okay. And let me just add a second point, that the statute provides for an agreement. But we would contend that that's not a — that is not an enforcement scheme. The statute does not say that the agreement can be enforced in state court. It doesn't say that the agreement can be enforced in federal court. Doesn't the agreement itself provide for enforcement? The only provision in the agreement that actually provides for enforcement actually gives the plaintiffs the right to an administrative hearing. Right. Which was denied to the plaintiffs in this case. That's a remedy. Did they pursue that administrative hearing? They weren't allowed to because the regulation that authorized the reduction prohibits the families from contesting in a state administrative hearing any aspect with respect to the reduction. So not only the reduction itself, but families were not allowed to actually go back in and try to renegotiate the amount of their payments to meet the needs of their other families. So are you saying then that the remedy provided in the agreement, which is, as you say, administrative appeal, right, that that remedy was rendered, I'll say, null and void by the state's new regulations? That's correct. And so, in effect, you had no remedy under the contract? The only — you had no remedy in terms of the state administrative proceeding to go in and challenge the action. And it's your position that's the only remedy that the contract itself provided or the statute authorizing the contract? Those are the only remedy — that's the only remedy that was expressly provided. Now, in any event, the plaintiffs certainly can go into state court to try to enforce their agreement. But I think that there are two problems with that in terms of deeming that the statute, that Congress had the intent to preclude private enforcement. I think, first of all, Congress doesn't have the authority to authorize states to be sued in their own courts. The state would have to consent to being sued — to be sued in their own court. There's nothing in the Adoption Assistance Statute — it does say that they have to ensure an agreement and the agreement has to be binding, but there's nothing in the statute that says that the plaintiffs have the right to go into state court. So I think it's questionable whether or not that could be a remedy just by providing that you have to have a contract. And this is a very similar argument that was made in a right v. relative with respect to housing tenants who were challenging the Public Housing Act whether or not a limitation on the amount of rent that they had to pay was violated by a housing authority charging them unreasonable utility charges that exceeded that rent ceiling. And the court stated in that case that the tenants were not precluded from coming into federal court to challenge the violation of the rent ceiling in the statute just because the statute required the tenants to have a lease agreement and that lease agreement had a provision dealing with this rent ceiling. And so we would contend that just having a contract alone is not a sufficient judicial remedy. It is certainly not enough to constitute a comprehensive remedial scheme that shows Congress's intent to preclude private enforcement. Why isn't the case moved? The case isn't moved because the regulation that authorized the budgetary reductions, first of all, is still in operation. And the appellants are still subject to the disabilities of that regulation. The post-judgment action for Oregon was to not repeal the reduction. It was to implement a new regulation that increased the adoption assistance payments. And so that the reduction, in effect, is still in place. So not only have the plaintiffs lost the benefits through the reduction, but more importantly, they still are suffering from the inability to have an administrative hearing on anything related to the reduction in terms of whether or not their contract rights were violated by the state. They also, in the adoption assistance program, if your family's circumstances change, you have a right to go in and try to renegotiate your contract amount. And the state regulation authorizing the reduction prohibits them from going back in and renegotiating their payment amount based on any change of circumstances that may have resulted from the regulation. So the case is not moved because it is a lie in continuing controversy. The regulation is still in effect, and the plaintiffs continue to suffer from the disabilities of the reduction regulation. Furthermore, even if we were just challenging the reduction of benefits, voluntary cessation by the state of the reduction would not be sufficient to render the case moved. We cited in our briefs the City of Mesquite case as an example of where a city has repealed an ordinance, and the case found that just because the city had voluntarily repealed it,    it didn't render the case moved because the city was free to implement the regulation again. In this case, they didn't actually even repeal the regulation. They are free to implement a future budgetary reduction by the regulation that is currently in effect. Again, on the federally enforceable rights question, again, if we look at the text and structure of the statute, I think it's clear that Congress intended to confer a federal right on plaintiffs to have their payments individually determined in accordance with the statute. That is, payments determined individually based on the needs of the individual child, the circumstances of the individual family, limited only by the AAP rate ceiling. And that they intended that that be done by agreement, and that agreement be binding. And so we believe that this case meets under the test laid out in Gonzaga, meets the test for conferring a federal right. And what should have happened is that the court should have looked to see whether or not there was a comprehensive remedial scheme that prohibited the plaintiff, that indicated that Congress intended to preclude private enforcement of determining whether or not their payment was determined in accordance with the statute. And just to sum up on the due process issue, we don't feel like the plaintiffs were afforded adequate due process. The notice was inadequate. It didn't mention anything about that the reduction was being made because of the AAP rate ceiling. Furthermore, they were not provided, as we mentioned before, the opportunity to an administrative hearing. If there are no more questions, I'll reserve my time for rebuttal. David Leath, representing Oregon, and each of the named defendants. There are four major issues in this case. The two may be termed procedural defenses, the mootness and the availability of Section 1983 to remedy the alleged violation. And the other two issues may be termed sort of the merits issues, whether the uniform across the board reduction in adoption assistance benefits violated Title IV-E and whether it was implemented in such a way as to violate due process. Oregon believes its defenses, the procedural defenses, will ultimately preclude review of the merits, but I nevertheless would propose to begin the staff this morning with a discussion of the merits issues because I think they provide important background and context for what Oregon did and why it did it, which I believe might be helpful to the court. As I noted, there are two merits issues, whether the reduction violated Title IV-E and whether it was implemented in accordance with due process. I propose to address those in that order. First, whether the benefit reduction violated Title IV-E, that question turns immediately to whether the reduction was authorized by the foster care maintenance cap under Section 671 or 673A3. That provision sets forth the standards that are supposed to be applied when entering into an adoption assistance agreement. It provides, however, in no case may the amount of the adoption assistance payment exceed the foster care payment, maintenance payment, which would have been paid during the period if the child had been in a foster family home. I think there are four possible constructions of that provision. First, it could be argued that the provision applies only at the time when the agreement is executed. As long as the payment doesn't exceed what would have been available in foster care at the time when the agreement is executed, the provision has been complied with and it has no further application. I don't think that that construction would give due respect to the provision of the foster care cap that applies that the payment cannot exceed the foster care maintenance payment that would have been paid during the period if the child had been in foster care. I think that term suggests that the cap applies not only initially but also to the periodic of payments under the agreement. So Oregon considered that construction method out from having to comply with the cap to be untenable. Let me move this along a little bit. Would any of the plaintiffs, the children involved and their parents, as the name plaintiffs, have hit the cap for themselves? The State of Oregon didn't understand itself to be required to make individual determinations, and so I don't know. When I look at the regulation, it says exceed the foster care maintenance payment, which would have been paid during the period if the child, with respect to whom the adoption assistant payment is made, had been in a foster family home. Doesn't that refer very specifically to a single child? Well, Your Honor, I think it does say the child. But I think that it doesn't say the group of children. It doesn't say foster children on the average. It says the child. It does say the child. And, of course, that's exactly the argument that the plaintiffs make, that if the foster care cap is going to be implied. So why isn't that persuasive? Well, I think it's not persuasive because it's extremely impractical. And I think sort of to step back a moment, in Souter v. Artist M, the Supreme Court stated that the directives of Title IV-E, the statute we're dealing with here, are largely left to the discretion of the implementing states. So I think that there's some important discretion there that needs to be taken into consideration. I think there's also, it's important to recognize that Oregon's interpretation of the cap as being properly implemented based on an across-the-board reduction in foster care maintenance by a similar across-the-board reduction in adoption assistance. It's really the only practical way of implementing the funding. Well, that's logical only if the adoption payments are at the ceiling at the very beginning. Well, you can't tell that until you go in and look at each one. Isn't that the claim being made by plaintiffs? And why isn't that persuasive? Well, it's not persuasive because it would be, what it would do is it would effectively lock in not only the adoption assistance payments, but it would also lock in foster care payments, because a state would be unable to make discretionary adjustments to the foster care program because it would be impractical and ultimately too expensive to implement the foster care cap in view of the reduction in foster care maintenance. It would be impractical to ensure compliance with the Adoption Assistance Act. Oregon's got thousands of adoption assistance agreements, and that pales, I'm sure, in comparison to the bigger states. If in Oregon each time we wanted to make a discretionary adjustment to foster care payments, which is in fact a rare event, these are important programs that are not touched unless many high priorities are reached before them. But if you wanted to reach foster care, you'd need to go through thousands of individual adoption assistance agreements to determine on a case-by-case basis whether each beneficiary would be entitled to, what level of foster care maintenance that each adoption assistance beneficiary would be entitled to if they were in foster care, and compare that to what the adoption assistance payments would be after the uniform reduction. I mean, it would just be illogistical. Maybe Congress did not intend to give power to make after-the-fact across-the-board reductions. I mean, if Congress had intended that, they could have provided for that. You're trying to infer that and say, well, we couldn't make across-the-board changes afterwards if you read the statute the way it's written, but maybe Congress didn't intend to permit that. And that construction, though, would mean that you couldn't make across-the-board reductions in foster care either, as a practical matter. And wouldn't that be illogical, given that at least for adoption agreements, you're supposed to negotiate those individually and enter binding agreements? I do understand the Court's point, but the point that I'm trying to make is that if you can't make the corresponding across-the-board reduction to adoption assistance, then you can't, as a practical matter, make changes to foster care either. So your argument now is turning out to be, because Congress must have permitted us to make across-the-board reduction in foster care, we're going to infer that we're allowed to make across-the-board reduction in adoption payments? Well, I don't think there's a dispute that states do have discretion to make adjustments to foster care payments. Does this say that the agreements can be amended unilaterally by the state? Well, that's Oregon's construction, that the foster care cap – that in no case shall the state make a payment that exceeds what would have been paid in foster care. So the state needs to figure out how to administer that provision. And our construction of it is that – and it's truly the only practical construction – is that one way that you can permissibly do that is by making a simultaneous and proportionally equal reduction in adoption assistance. And that is, by the way, consistent with the Department of Health and Human Services' construction of the provision. The manual provision that we cited states that. But we don't really know what effect that would have on the individual circumstance to do it, because we don't know how close each individual came to the foster care limit. No, that's correct. And again, to find out – And how does that lead to the across-the-board reduction of the actual adoptive amount? Well, to determine – again, to determine whether each individual was implicated by the foster care cap on a case-by-case basis would just be practically prohibitive. I mean, if that's what the statute requires, then – and that will be the issue, I would suggest. That will be the issue when plaintiffs bring their actions on their agreements in state court. What Oregon's defense will be that the foster care cap is part of the agreement, it's an implied term of the agreement, it sets a ceiling for payments, and Oregon administered the cap in the way that it did. In this case, wasn't there a just across-the-board reduction for all the adoptive amounts? It wasn't individual. No, that's correct, Your Honor. It was across-the-board reduction, 7.5% reduction in foster care. So as you say, when it comes up for individual consideration, they'll be looking at this. I don't think there's anything to look at. Well, the plaintiff's claim in their state court action will be that there should not have been an across-the-board reduction in adoption assistance. Well, that's claimed out here, too, I think. And Oregon will point to the implied term of the agreements that we say authorized it. Well, the implied term is only that you read in the foster care cap, because that's not in the agreement itself, I take it. And you read it in because it's the law, the land is set forth in the federal statute. Is that correct? That's correct. The federal statute doesn't say anything about across-the-board. So that's still another read-in that you're taking, not from the statute, but from the argument that it's not practical otherwise. From what we think is an authoritative construction of that provision that's entitled to deference and also that's supported by health and human services interpretation of the same provision. In fact, health and human services. So why should health and human services' understanding of that provision be binding and affect a binding agreement entered between the state and an individual family? Well, the term from the statute is implied into the agreements, and health and human services and Oregon both, I think, are entitled to deference. Why should that deference be applicable to a party that's entered into a binding agreement? If I enter an agreement with the state, I don't sign something that also says, and the state gets to decide how this contract is interpreted. I understand what you're saying with regard to interpretation of regulations, Chevron deference and all. I don't see how that has any application whatsoever with regard to a binding agreement entered into between the government and a citizen. Well, it would seem to me that if the contract incorporates a term of a statute and the statute is subject to construction. Well, let the prosecutor say, look, I know statutes. Trust me, jury, this statute is meant to cover this defendant's behavior. So just convict him on my say-so. I mean, we let the government say so then? No, Your Honor. Then why do we let the government decide for itself how to interpret a contract between the government and a citizen? Well, it's an interesting situation that the statute itself creates by having the state not only be a party to the contract but also be, in effect, administering the program. But that is the situation that Congress created. Why would Congress create a binding agreement if the state gets to decide for itself how to interpret the contract? Well, I don't think – I'm not suggesting that the state gets to interpret the contract any way it wants. I think the state is going to be subject to scrutiny in state court or perhaps here with respect to how it's construed the contract. My point is that the state construed the contract the only way that it could practically and that we think it was a lawful way. And I guess I would also add with respect to whether the reduction violated Title IV-E. Plaintiffs claim that it did. But, in fact, what they're saying is that Oregon was overly conservative in its compliance with the foster care cap, not that it violated the cap. And perhaps if it's true that we were unlawfully conservative in our compliance with the cap, then it would be true that we violated the agreement. But it would not be true that we violated Title IV-E. Well, Title IV-E says shall be determined through agreement between the adoptive parent. The amount of the payment shall be determined through agreement. However, you can't go over the limit. Well, you could say, well, we're going to be real conservative and we're not going to pay a cent. Would you say that complies with a statute that says the amount should be determined through agreement? Well, I think what the statute says is that the answer is no. So there is some substance to the statute itself. It's not just because you're deciding to be real conservative in applying the foster care cap that you're allowed to get away with what you want. I'm not sure that in the hypothetical that the court gives that the state was, in fact, doing anything with the foster care cap. It was just not paying the money. And, in fact, I suppose that my argument would be that there, again, the problem is with whether the state has complied with the agreement, not with whether it's complied with the act provided that the state did go through the process, the procedures that are mandated by the act, that it did negotiate individually adoption assistance agreements with each of the families based on their particular circumstances and did make those agreements binding. If the state has complied with those procedural requirements, then I think that the parties characterize the issue somewhat differently when it comes to whether there's the Section 1983 right. Plaintiffs say that the state has failed to negotiate individual payments with them, and the state says, no, but the complaint is about whether the state's paying the amounts that were agreed to. And those are really the same issue on a timeline, I think. Plaintiffs have a pretty good argument, if it was the issue in the case, that there's a right under Title IV-E to have the state negotiate those agreements in good faith based on individual circumstances and make them binding. But once that's been done, and I think that this was the point that Judge Clifton was making earlier, once that's been done, the amount of the individually determined payment is liquidated in the binding agreement, and that's where you look to from then on to enforce your right to an individually determined payment. Why else, as the Court asked, why else would Congress have made the individual agreements binding? Well, let's move us to that issue then, because I think that's the mootness, I suppose, is legally the threshold, but for me, as I indicated earlier, the hardest question, I think, that I pose to the appellants, I want to pose to you as well, but now with the gloss given by appellants' answer to that question, which included that the existence of a binding lease agreement in the Roanoke case did not prevent the Court from finding a 1983 action. Right. I think that Wright v. Roanoke is an important case, and it's an important case to distinguish, and it is definitely distinguishable. The touchstone in these cases is congressional intent. In Wright v. Roanoke, the lease requirement, the lease provision that the defendants pointed to as an alternative remedy that could have been used in lieu of a Section 1983 case, that lease requirement was not part of the statute. It was part of the federal regulation. It couldn't possibly have had any bearing whatsoever on Congress's intent to provide, to make Section 1983 available. In addition, Congress had no idea that there was going to be a lease requirement when it was adopting the statute that the plaintiffs sought to enforce there. Here, by contrast, Title IV-E itself in the statute, Congress required that these adoption assistance agreements be binding. Congress, not any administrative agency, Congress provided the alternative remedy, and under the Rancho Palos Verdes case, Congress's provision of an alternative remedy creates a presumption that it intended to supplant Section 1983. What's the alternative remedy? Plaintiff's alternative remedy, well, actually, the one that Congress provided is an action on the agreement, and that's available. Plaintiffs continue to say that it's not. I don't know why they haven't tried. The state courts are open, and if the plaintiffs seek to invoke their jurisdiction to sue otherwise. Are you ready to stand here and waive the Eleventh Amendment immunity under Alden v. May? I don't believe there's an Eleventh Amendment issue with respect to enforcement of the state's binding agreements. The plaintiffs say that this would be like Congress making the state amenable to a suit in the state's courts. I don't think that's a colorable argument. Yeah, exactly what Congress is doing here. Well, the remedy is to sue the state. Congress was saying that participating states and participation in Title IV-E is voluntary. Participating states must enter into binding adoption assistance agreements. The state participates in the program voluntarily, and the state enters into the agreements voluntarily, and the state commits in its state plan that those agreements will be enforceable. The state stands ready to make good on that commitment. I think that's a precise question. That's before the Supreme Court now. In other words, whether when the state accepts federal funds, that it has attached to it a condition of waiving the Eleventh Amendment immunity that the waiver is good. Well, Your Honor, we certainly aren't here to argue that we've got an Eleventh Amendment defense if we're sued by these private individuals in state court on our agreement. Your Honor, I don't believe there's an Eleventh Amendment immunity to waive in that circumstance. So Rice Distinguishable, and I think that Ranchos Palos Verdes, is controlling. There's no reason that I can think of why Congress's provision of an alternative remedy through the binding agreements shouldn't be given effect and supplant, just as it did in Rancho Palos Verdes, as in Alexander v. Sandoval. And in fact, I think as in this court's case of Mansart, the provision of the alternative remedy expressly by Congress creates a presumption that the plaintiffs have not overcome that that remedy is to supplant Section 1983 and does not complement it, particularly whereas here the remedy is more limited. And I think Rancho Palos Verdes is quite clear on that point. So in conclusion, I see I'm out of time. We would ask that the district court's judgment dismissing plaintiff's case be affirmed. Thank you. Thank you. I'd just like to make a few points in rebuttal. First of all, none of the plaintiffs, in terms of the facts of the case, none of the plaintiffs had reached the foster care maintenance cap. One of the things to note with foster care is that it's a different program than adoption assistance. Adoption assistance is a program in which you have individually determined payments. In foster care, you have a standardized rate schedule. And for families, it's highly unlikely that any family will ever be at the cap if they have an adoption assistance agreement that is in place for more than a year. Foster care rates increase according to a standard based on the age of the child. And when families negotiate their adoption assistance agreement, they don't necessarily get the maximum payment. Secondly, there's a whole system of specialized care rates that are based on the needs of the child at the time of the agreement, so it's unlikely that any family would be at the cap. The State argues that it wouldn't be practical to make individual determinations, but that's the nature of this program. It's really not practical to sit down or efficient for a government to sit down and negotiate individual contracts based on the individual needs of the child and the individual family circumstances, but that's the program that Congress created. Secondly, the Oregon State's One thing that wasn't clear to me is, is there a new agreement reached each year? No, there isn't a new agreement. And again, any new agreement, there is not a new agreement each year. And one of the things that HHS also has a rule on is that you can't have across the board durational requirements in an adoption assistance agreement. So you can individually negotiate a short term for an agreement, but you can't have all agreements that expire in a year. So, no, there's not a new agreement each year. They also say it's impractical to make these individual determinations, yet they're willing to go to state court and spend the time not only on the court costs, but making those individual determinations in state court. In terms of the HHS interpretation, it should not be afforded deference. It's not a regulation. And if we use the Chevron case, it's not a duly promulgated regulation. It wasn't subject to the rulemaking requirements of notice and public comment. And most importantly, it's inconsistent with the plain language of the statute. Oregon states that the city of Rancho Palos Verdes case supports their position. However, that case is clearly distinguishable. In that case, Congress put in an express judicial remedy, a remedy that basically said that you had a right to go into any court of competent jurisdiction, but you had to do it within 30 days. And what the court found was that that was a comprehensive remedial scheme that was inconsistent with private enforcement because it limited what you could do under Section 1983, and so that they couldn't have meant that that Section 1983 would have been a complementary enforcement mechanism. Oregon also cites Manshardt as support. But again, that was an implied right of action case. And in Manshardt, they actually distinguish the difference between the Section 1983 case and the implied right of action case citing a city of Stockton v. Price, which dealt with a housing and community development program in which dislocated tenants, the Ninth Circuit found that they were entitled to reasonable relocation benefits in that case. And so I don't think that that case supports plaintiff's State of Oregon's position. So the appellants would conclude by saying that the district court's dismissal should be reversed and that this court should find that they have an enforceable federal right to have individually determined payments. Thank you. Thank you, counsel. Thank both counsel for your assistance and arguments in this complicated and challenging case. It is submitted. And we'll move to the last case on the morning's calendar, Lay v. Tree Source Industries. Thank you, counsel. Thank you.
judges: Hug, Tashima, Clifton